RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 23a0056p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

―――――――――――

UNITED STATES OF AMERICA *ex rel.* SHANNON
MARTIN, M.D.; UNITED STATES OF AMERICA *ex rel.*
DOUGLAS MARTIN,

                              *Relators-Appellants,*

    *v.*

DARREN HATHAWAY, M.D.; SOUTH MICHIGAN
OPHTHALMOLOGY, P.C.; ELLA E. M. BROWN
CHARITABLE CIRCLE, dba Oaklawn Hospital,

                            *Defendants-Appellees.*

No. 22-1463

―――――――――――

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:19-cv-00915—Jane M. Beckering, District Judge.

Argued: March 8, 2023

Decided and Filed: March 28, 2023

Before: SUTTON, Chief Judge; SILER and MATHIS, Circuit Judges.

―――――――――――

## COUNSEL

**ARGUED:** Julie A. Gafkay, GAFKAY LAW PLC, Saginaw, Michigan, for Appellants. Mary Massaron, PLUNKETT COONEY, Bloomfield Hills, Michigan, for Appellees Darren Hathaway, M.D. and South Michigan Ophthalmology, P.C. Jonathan S. Feld, DYKEMA GOSSETT PLLC, Chicago, Illinois, for Appellee Ella E. M. Brown Charitable Circle. Daniel Winik, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for United States as Amicus Curiae. **ON BRIEF:** Julie A. Gafkay, GAFKAY LAW PLC, Saginaw, Michigan, Floyd E. Gates, Jr., Christopher J. Zdarsky, BODMAN PLC, Grand Rapids, Michigan, for Appellants. Mary Massaron, PLUNKETT COONEY, Bloomfield Hills, Michigan, for Appellees Darren Hathaway, M.D. and South Michigan Ophthalmology, P.C. Jonathan S. Feld, Mark J. Magyar, Andrew T. VanEgmond, DYKEMA GOSSETT PLLC, Chicago, Illinois, Lisa A. McNiff, SCHROEDER DEGRAW PLLC, Marshall, Michigan, for Appellee Ella E. M. Brown

Charitable Circle.  Daniel Winik, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Jessica L. Ellsworth, HOGAN LOVELLS US LLP, Washington, D.C., for Amici Curiae.

SUTTON, C.J., delivered the opinion of the court in which SILER, J., joined in full, and MATHIS, J., joined in part and in the judgment.  MATHIS, J. (pg. 17), delivered a separate opinion concurring in all but Section II.A. of the opinion.

———————————

**OPINION**

———————————

SUTTON, Chief Judge.  The False Claims Act imposes civil liability for "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim [to the government] for payment or approval."  31 U.S.C. § 3729(a)(1)(A).  The Act allows individuals with knowledge of false claims to bring private lawsuits, known as *qui tam* lawsuits, on behalf of the government. *Id.* § 3730(b).  Among other types of false claims, the Act covers claims for "items or services resulting from a violation" of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(g), which prohibits medical providers from making referrals "in return for" "remuneration," *id.* § 1320a-7b(b)(1)(A).  At issue in this case is (1) whether a hospital's decision not to hire an ophthalmologist in return for a general commitment of continued surgery referrals from another ophthalmologist for patients from the local community counts as the kind of "remuneration" covered by the Anti-Kickback Statute and (2) whether claims from such continued referrals "result[] from" violations of the statute.  *Id.* § 1320a-7b(b)(1), (g).  Because we agree with the district court that this kind of claim does not establish a cognizable kickback scheme, we affirm the dismissal of this *qui tam* complaint.

I.

Oaklawn Hospital is located in Marshall, Michigan, a small city in the southern part of the State.  When Oaklawn patients from Marshall need ophthalmology services, they have one locally based option, South Michigan Ophthalmology, P.C.  This practice group had two private physicians, Dr. Darren Hathaway (the owner of the practice) and Dr. Shannon Martin (an employee of the practice).  When these two ophthalmologists referred patients from Marshall for

surgery, they tended to use the most convenient local option, Oaklawn. Oaklawn and South Michigan have referred Marshall-based patients to each other for many years.

Friction in these business relationships developed in 2018. Dr. Hathaway, the sole shareholder of South Michigan, began negotiating a merger with Lansing Ophthalmology, P.C. (LO Eye), a larger practice based in the State's Capitol. When Dr. Martin heard about the merger, she asked whether she would be able to work with LO Eye. When that fell through, she began negotiations with Oaklawn.

Dr. Martin's discussions with Oaklawn had a promising start, perhaps facilitated by her husband, Douglas Martin, who served as the Director of Finance for Oaklawn Hospital. On October 17, Oaklawn extended her a tentative offer to be a physician based at the hospital, subject to board approval. Consistent with the offer, the Board heard a rumor that Dr. Hathaway planned to move South Michigan's surgeries elsewhere—an Ambulatory Surgery Center located in Battle Creek, about a thirty-minute drive from Marshall—after his merger with LO Eye, making it sensible for South Michigan to hire an internal ophthalmologist.

An Oaklawn employee told Dr. Hathaway about the pending offer and conveyed Oaklawn's impression that Dr. Hathaway intended to move his surgeries to another hospital. Dr. Hathaway met with Oaklawn's interim CEO, Gregg Beeg, on October 22. Dr. Hathaway told Beeg that in fact he did not have any plans to pull his surgeries from Oaklawn, that he wanted to continue referring his Marshall patients who needed surgery to Oaklawn, and that he actually "expect[ed] business to increase" in the future. R.64-4 at 9. Dr. Hathaway told him that, if the Board approved the offer, it would be the "death knell" of his practice because Oaklawn's future patient referrals would go to Dr. Martin, the new, internal ophthalmologist. R.64 ¶ 23. Beeg encouraged Dr. Hathaway to speak to other board members.

In the coming days, Dr. Hathaway spoke with at least four board members. Dr. Hathaway also drafted a letter to the Board reiterating these points and explaining that his merger with LO Eye would allow LO Eye to take over his administrative duties and, with "more efficient operations" after the merger, he expected that he could increase business for Oaklawn. R.64-5 at 3. If Oaklawn hired Dr. Martin, Dr. Hathaway argued, that would be a lose-lose

situation because it would cost Oaklawn "hundreds (plural) of thousands of dollars" to set up an internal ophthalmology line while it would "force" Dr. Hathaway "against [his] will (because [he had] no desire to pull out whatsoever), to pull out [his] cases and take them elsewhere." *Id.* at 3–4. LO Eye confirmed Dr. Hathaway's account in a letter to the Board, stating that it "anticipate[d] the surgical volume of the practice will be greater in this new model, and [it had] no intention of taking that volume elsewhere." *Id.* at 5.

The Board met on October 26. Before the vote, several board members expressed concern about losing business if they hired Dr. Martin. The Board voted not to hire Dr. Martin. The Board Chairman called Dr. Hathaway to let him know about the decision. Another member texted Dr. Hathaway that Oaklawn "appreciate[d] all of [his] support," wanted to "continue that partnership," and that she was "[l]ooking forward to increased surgical volume." R.64 ¶ 47. Dr. Hathaway responded, "[i]t's coming." *Id.* As it turns out, the LO Eye merger with South Michigan fell through. And as things eventually played out, Dr. Hathaway continued as sole proprietor of South Michigan, and Dr. Martin set up her own practice in Marshall.

All of this did not sit well with Dr. Martin. She and her husband sued Dr. Hathaway, South Michigan, and Oaklawn Hospital in this *qui tam* action under the federal False Claims Act, 31 U.S.C. §§ 3729(a), 3730(b), and Michigan's Medicaid False Claims Act, Mich. Comp. Laws § 400.601. The Martins claimed that Dr. Hathaway and Oaklawn engaged in an illegal fraudulent scheme under the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, and that claims for Medicare and Medicaid reimbursement resulting from the kickbacks violated the False Claims Act. The Martins sought between $5,000 and $10,000 for each fraudulent claim plus treble damages. After receiving notice of the lawsuit, the United States declined to intervene. The district court dismissed the Martins' complaint with leave to amend because it did not particularly allege any false claims that Oaklawn or Dr. Hathaway submitted to the government.

The Martins filed an amended complaint, adding 22 claims that Oaklawn and South Michigan submitted for reimbursement based on referrals. Oaklawn and Dr. Hathaway again moved to dismiss. The district court granted the motion, rejecting each of the federal claims as a matter of law and declining to exercise supplemental jurisdiction over the state law claims.

II.

Each of the allegations in the complaint turns on a variation on a theme—that Oaklawn Hospital's rejection of Dr. Martin's employment in return for Dr. Hathaway's commitment to continue sending local surgery referrals violated the Anti-Kickback Statute.  At the motion to dismiss stage of a case, we must accept as true all plausible factual allegations in the complaint. In the context of allegations of "fraud," Rule 9(b) of the Federal Rules of Civil Procedure requires the claimant to state with "particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  That means *qui tam* plaintiffs must "adequately allege the entire chain—from start to finish—to fairly show defendants caused false claims to be filed."  *United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 914 (6th Cir. 2017).   The complaint thus must specify the "who, what, when, where, and how" of the alleged fraudulent scheme.  *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006) (quotation omitted).

This complaint contains two legal flaws under the Anti-Kickback Statute and the False Claims Act.  It does not turn on a cognizable theory of remuneration, and it fails to establish causation.

A.

*Remuneration.*   The Anti-Kickback Statute establishes criminal and civil liability for "knowingly and willfully offer[ing] or pay[ing] any *remuneration* (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to refer an individual to a person for the furnishing . . . of any item or service" that is reimbursable under a federal health care program.  42 U.S.C. § 1320a-7b(b)(2)(A) (emphasis added).  The statute applies to solicitations and receipts of such payments: Anyone who "solicits or receives any remuneration . . . in return for referring an individual" under the same circumstances will also face criminal and civil liability.  *Id.* § 1320a-7b(b)(1)(A).

The statute does not define remuneration.  At stake is whether it covers just payments and other transfers of value or any act that may be valuable to another.  For the reasons that follow, it covers just payments and other transfers of value.

Congress first penalized the offer of "remuneration" in return for patient referrals in 1977 when it amended the Social Security Act. Medicare-Medicaid Anti-Fraud and Abuse Amendments, Pub. L. 95-142, § 4(a), (b), 91 Stat. 1179, 1181 (1977). Dictionaries around that time consistently described remuneration as a form of payment. *See, e.g.*, *Remuneration*, Webster's Third New International Dictionary 1921 (1976) ("an act or fact of remunerating," further defined as "to pay an equivalent for (as a service, loss, expense)"); *Remuneration*, Webster's New Twentieth Century Dictionary 1530 (2d ed. 1975) (similar); *Remuneration*, The American Heritage Dictionary of the English Language 1101 (1975) (similar); *Remunerate*, The Oxford Universal Dictionary Illustrated 1702 (3d ed. rev. 1970) (similar); *see also* *Remuneration*, Black's Law Dictionary 1165 (5th ed. 1979) ("Reward; recompense; salary; compensation.").

Other uses of remuneration by Congress around the same time treated remuneration as something "paid" or transferred. *See, e.g.*, Tax Treatment Extension Act of 1977, Pub. L. 95-615, § 209, 92 Stat. 3097, 3109 (1978) (applying a wage withholding amendment to "remuneration paid after the date of enactment"); Social Security Amendments of 1977, Pub. L. 95-216, § 103, 91 Stat. 1509, 1513 (1977) (determining contribution and benefit base "with respect to remuneration paid"); *id.*, § 355, 91 Stat. at 1555 (allowing employers to take certain tax deductions if they "pa[id] to an employee cash remuneration").

Context points in a similar direction. In the relevant sentence, the statute refers to remuneration in "cash" or in "kind," two words that suggest payments or transfers of some sort. The statute also offers three non-exhaustive examples of remuneration: kickbacks, bribes, and rebates. Kickbacks and bribes usually involve payments of money or transfers of specific items of value, and rebates customarily involve amounts of money owed. As the Supreme Court recently confirmed, other federal laws that prohibit bribery require more than acts that may be of value to another. They bar "*quid pro quo* corruption—the exchange of a thing of value for an 'official act.'" *McDonnell v. United States*, 579 U.S. 550, 574 (2016).

In exempting some payments and transfers from remuneration, Congress conveyed a similar impression. The statute excludes several financial exchanges from potential criminal penalty, confirming that Congress thought these practices otherwise counted as remuneration.

Notably, each exemption has a payment quality. The safe harbor exemptions range from certain discounts or reductions in price and vendor payments to provisions of "goods, items, services, donations, loans, or a combination thereof" to health center entities serving underserved populations. 42 U.S.C. § 1320a-7b(b)(3)(I); *cf. Arellano v. McDonough*, 143 S. Ct. 543, 548–49 (2023) (drawing structural inference from a list of sixteen statutory exceptions). At the same time, Congress also directed the Secretary of the Department of Health and Human Services to promulgate regulations adding any other safe harbors "specifying *payment practices* that shall not be treated as a criminal offense under [the Anti-Kickback Statute]." 42 U.S.C. § 1320a-7d(a)(1)(A)–(B) (emphasis added). A common theme links each of these regulatory safe harbors: a transfer of value from one to another. *See generally* 42 C.F.R. § 1001.952; *see also HollyFrontier Cheyenne Refin., LLC v. Renewable Fuels Ass'n*, 141 S. Ct. 2172, 2177 (2021) (concluding that "extension" had a temporal character because other listed "extensions" shared the same quality).

A cousin of the Anti-Kickback Statute—the civil penalties section of the Social Security Act—also indicates that remuneration requires a payment or transfer of value to another. It imposes fines on any person who "offers [] or transfers remuneration to any individual eligible for benefits" to influence the individual's choice of medical providers. Health Insurance Portability and Accountability Act of 1996, Pub. L. 104-191, § 231, 110 Stat. 1936, 2014 (1996); *see* 42 U.S.C. § 1320a-7a(a)(5). Congress defined "remuneration" to "includ[e] the waiver of coinsurance and deductible amounts . . . and transfers of items or services for free or for other than fair market value." § 231, 110 Stat. at 2014; 42 U.S.C. § 1320a-7a(i)(6). Our circuit has assumed twice before that this definition—one that entails a "transfer"—applies to the Anti-Kickback Statute and the Social Security Act. *See Miller v. Abbott Labs.*, 648 F. App'x 555, 561 (6th Cir. 2016) (per curiam); *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394, 400 (6th Cir. 2015).

Other statutes across the legal landscape refer to different types of remuneration yet none of them changes the essence of remuneration as a payment or transfer. The Railroad Retirement Tax Act's reference to "money remuneration" excludes stock options because elsewhere in the U.S. Code Congress referred to "all remuneration." *Wis. Cent. Ltd. v. United States*, 138 S. Ct.

2067, 2071–72 (2018). The Social Security Act offers a range of settings: "[W]ages" in one context is "remuneration paid," 42 U.S.C. § 409(a); services in another are activities "performed for remuneration or gain," *id.* § 422(c)(2); and in another "rebates, discounts, [and] price concessions" are described as forms of remuneration, *id.* § 1395w-115(f)(3)(A)(i). The same goes for other federal laws. *See, e.g.*, 8 U.S.C. § 1324c(e) (criminalizing the failure to disclose that a person received a "fee or other remuneration" for assisting with false applications for immigration benefits); 10 U.S.C. § 974(b) (prohibiting military musicians from receiving additional "remuneration for an official performance"); 22 U.S.C. § 1641p (using remuneration to describe payments to agents, attorneys, and representatives); 26 U.S.C. § 4960(c)(3) (defining remuneration as wages); 29 U.S.C. § 1185n(a)(9) (requiring group health plans to annually submit a report on "[a]ny impact on premiums by rebates, fees, and any other remuneration paid by drug manufacturers to the plan").

The Office of Inspector General seems to accept this approach. *See* 42 U.S.C. § 1320a-7d. Its advisory opinions define "remuneration" as "the transfer of anything of value, directly or indirectly, overtly or covertly, in cash or in kind." U.S. Dep't of Health & Hum. Servs, Off. of Inspector Gen., Advisory Op. No. 22-14, at 5 (June 29, 2022) (provision of continuing education programs); *see also* U.S. Dep't of Health & Hum. Servs, Off. of Inspector Gen., Advisory Op. No. 99-8 (July 13, 1999) (provision of free physician consultations). The Office's guidance sticks to the same trail. It describes the Anti-Kickback Statute as a "criminal prohibition against *payments* (in any form, whether the payments are direct or indirect) made purposefully to induce or reward the referral." OIG Supplemental Compliance Program Guidance for Hospitals, 70 Fed. Reg. 4858, 4863–64 (Jan. 31, 2005) (emphasis added). In issuing a special fraud alert, the Office focused on potentially illegal incentives that hospitals may offer to physicians. The variety of flagged practices all entail exchanges of financial value, such as the "use of free or significantly discounted office space," "free or significantly discounted billing, nursing or other staff services," "interest-free loans," and low-cost "[c]overage on hospitals' group health insurance plans." Publication of OIG Special Fraud Alerts, 59 Fed. Reg. 242 (Dec. 19, 1994).

While other appellate courts have not faced this precise issue, they define remuneration in the same way, one that entails a payment or transfer. *See Wis. Cent. Ltd.*, 138 S. Ct. at 2071

(A statute that taxed "'any form of money remuneration,' . . . indicate[d that] Congress wanted to tax monetary compensation."); *United States v. Greber*, 760 F.2d 68, 71 (3d Cir. 1985) ("Remunerates" covers efforts "to pay an equivalent for service." (quotation omitted)); *Guilfoile v. Shields*, 913 F.3d 178, 189 (1st Cir. 2019) ("Essentially, the [Anti-Kickback Statute] targets any remunerative scheme through which a person is paid in return for referrals to a program under which payments may be made from federal funds." (quotation omitted)); *Pfizer, Inc. v. HHS*, 42 F.4th 67, 75 (2d Cir. 2022) ("'Remuneration' means [p]ayment; compensation, esp[ecially] for a service that someone has performed, and the modifier 'any' further broadens the scope of the phrase." (alteration in original) (quotation omitted)).

The setting of this statute also supports this reading. Recall that the same language creates civil *and* criminal liability. In the context of dual-application statutes like this one, we give the same interpretation to the same words, whether applied in a civil or criminal setting. That means that, if ambiguity exists over the meaning of a provision, the rule of lenity favors the narrower definition. *Barber v. Thomas*, 560 U.S. 474, 488 (2010); *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004); *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 518 n.10 (1992) (plurality); *id.* at 519 (Scalia, J., concurring in judgment); *Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 727 (6th Cir. 2013).

There is one other problem with the broader definition. It lacks a coherent end point. Consider the hospital that opens a new research center, purchases top of the line surgery equipment, or makes donations to charities in the hopes of attracting new doctors. Or consider the general practitioner who refuses to send patients for kidney dialysis treatment at a local health care facility until it obtains more state-of-the-art equipment. Are these all forms of remuneration? Unlikely at each turn.

Measured by this definition, the complaint fails to allege a cognizable kickback scheme.

The complaint's key theory of remuneration turns on the Oaklawn Board's refusal to hire Dr. Martin in return for Dr. Hathaway's general commitment to continue sending surgery referrals for his patients to Oaklawn. But Oaklawn's decision not to hire someone does not entail a payment or transfer of value to Dr. Hathaway. While Oaklawn's decision may have

benefitted Dr. Hathaway—it prevented Oaklawn's patient referrals from being sent to an ophthalmologist who worked at the hospital—Oaklawn never offered Dr. Hathaway anything at all. Oaklawn's decision not to hire or support Dr. Martin, it is true, helped Dr. Hathaway continue his practice as before and perhaps helped him to further negotiations to merge with LO Eye. But that is not remuneration by any standard definition of the term. The long and the short of it is that this business dispute ended as it began: Dr. Hathaway continued to treat patients in Marshall and continued to refer them to Oaklawn for any needed surgeries.

Even under an anything-of-value definition of remuneration, moreover, it is doubtful that the Martins allege a cognizable referrals-for-referrals scheme. Consider how vague, how non-concrete, the alleged agreement was. It had no time frame. It had no specific volume requirement. It applied only to patients from the same town in which the hospital was located and only if the hospital offered the surgery service—thus applying only when it was most natural to refer patients in each direction. It had no condition on use of certain services at the hospital— say use of a certain type of medical equipment based on how many referrals a doctor made. And it did not come with any other guarantees. While it is difficult to imagine a statute with criminal application applying to something as vague as "anything of value," we suspect that any such application would be ironed out with more specific requirements, conditions, and commitments. Any such refinements are not found in this complaint or the briefs of the parties. Nor for similar reasons, we suspect, have we found any cases treating a decision not to hire someone as remuneration covered by the Anti-Kickback Statute.

The Martins and the government, as *amicus curiae*, resist this conclusion. They note that the law prohibits "any" remuneration, a word of expansion, not confinement. *United States v. Gonzales*, 520 U.S. 1, 5 (1997). But that reality proves only that the statute covers remuneration of any type (cash, services, goods), not that Congress altered its customary meaning.

The Martins and the government point out that the 1972 precursor to the Anti-Kickback Statute made it a misdemeanor to solicit, offer, or receive kickbacks, bribes, and rebates, suggesting that the 1977 addition of remuneration to the statute expanded coverage of the law. Social Security Amendments of 1972, Pub. L. 92-603, §§ 242(c), 278(b)(9), 86 Stat. 1329, 1419, 1454 (1972). Maybe so. The new law, it is true, covered "any remuneration (including any

kickback, bribe, or rebate)"—and made the improper transfer a felony to boot. But, again, this does not show that Congress rejected the traditional meaning of remuneration. It shows only that payments in any form in this context—"directly or indirectly, overtly or covertly, in cash or in kind"—would not escape criminal penalty. *See Greber*, 760 F.2d at 72 ("By adding 'remuneration' to the statute . . . Congress sought to make it clear that even if the transaction was not considered to be a 'kickback' for which no service had been rendered, payment nevertheless violated the Act.").

What of the statute's purpose—to dissuade medical providers from making patient recommendations with an eye toward financial motives rather than medical necessity? But statutory purpose is best gleaned from the four corners of the statute. While the word remuneration may be broad, it customarily requires a payment or transfer of some kind. "[E]ven the most formidable argument concerning the statute's purposes could not overcome the clarity [of] the statute's text." *Kloeckner v. Solis*, 568 U.S. 41, 55 n.4 (2012). In this instance, there is no evidence that anyone paid anyone anything or changed the value or cost of any services that otherwise would have been received.

The Martins and the government insist that Oaklawn Hospital's decision not to hire Dr. Martin amounted to an offer of referrals to Dr. Hathaway. But that's not what happened. In refusing to hire Dr. Martin, Oaklawn simply left things where they were. Taken to its no-stopping-point conclusion, Dr. Martin's theory of liability might make *her* liable for referrals from Oaklawn before these negotiations began in connection with her referral of surgery patients to Oaklawn. Nothing in the complaint, moreover, shows that physicians at Oaklawn lacked authority to refer their patients to whatever ophthalmologists they wished.

The reader may recall that the False Claims Act uses the word "payment" and the Anti-Kickback Statute uses the word "remuneration," prompting the question whether remuneration means something broader. *Compare* 31 U.S.C. § 3729(a)(1)(A) (prohibiting the presentment of false claims "for payment or approval"), *with* 42 U.S.C. § 1320a-7b(b)(1)–(2) (prohibiting the solicitation or receipt of "remuneration" in exchange for referrals). Two problems face this argument. One is that it is unclear whether the words capture any difference in meaning. Keep in mind that the relevant dictionaries defined "remuneration" as "payment." *See, e.g.*,

*Remuneration*, Webster's Third New International Dictionary 1921 (1976).  The other is that payment in this context amounts to nothing more than the cash form of remuneration.  That's because the False Claims Act takes aim at cash reimbursements from the government, while the Anti-Kickback Statute targets more types of payments, including those made "in cash or in kind."  42 U.S.C. § 1320a-7b(b)(1)–(2).

B.

*Causation.*  The claimants face another problem:  Neither Oaklawn nor Dr. Hathaway submitted claims for Medicare or Medicaid reimbursement for "items or services resulting from [the] violation" of the Anti-Kickback Statute.  *Id.* § 1320a-7b(g).  When it comes to violations of the Anti-Kickback Statute, only submitted claims "resulting from" the violation are covered by the False Claims Act.  *Id.*  The ordinary meaning of "resulting from" is but-for causation.  *See Burrage v. United States*, 571 U.S. 204, 210–11 (2014).  That understanding applies unless strong "textual or contextual indication[s]" indicate a "contrary" meaning.  *Id.* at 212.  None exists.  As in *Burrage*, Congress added the "resulting from" language in 2010, against the backdrop of a handful of cases that observed similar language as requiring but-for causation.  *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) ("because of"); *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 63 (2007) ("based on"); *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 265–68 (1992) ("by reason of").  Our cases embrace a similar approach.  *United States v. Volkman*, 797 F.3d 377, 392 (6th Cir. 2015) (applying *Burrage*); *United States v. Miller*, 767 F.3d 585, 591–92 (6th Cir. 2014) ("because of"); *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 321 (6th Cir. 2012) (en banc) ("because of"); *see also Wild Eggs Holdings, Inc. v. State Auto Prop. & Cas. Ins. Co.*, 48 F.4th 645, 649 (6th Cir. 2022) ("resulting from" in insurance policy); *Nicholas v. Mut. Benefit Life Ins. Co.*, 451 F.2d 252, 256–57 & n.3 (6th Cir. 1971) ("results from" in insurance policy).

The Eighth Circuit took this approach in this precise setting.  *United States ex rel. Cairns v. D.S. Medical L.L.C.* reasoned that context could not overcome the ordinary meaning of the text—that "resulting from" means but-for causation.  42 F.4th 828, 834–36 (8th Cir. 2022).  The government argued that several pre-2010 false certification cases did not require a causal link between the kickback scheme and the claim presented.  As the government saw it, the 2010

statutory amendment had "simply codified" the holdings of those cases. *Id.* at 836 (quotation omitted). The Eighth Circuit responded that Congress could have codified those cases by using language that did so. *Id.* "[T]ainted by" or "provided in violation of," for example, would have set out an alternative causation standard. *Id.* But Congress used "resulting from," an "unambiguously causal" standard even in the face of these pre-amendment cases. *Id.* Where a statute "yields a clear answer, judges must stop." *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019).

The Martins have not plausibly alleged but-for causation. The problem for the Martins is that the alleged scheme did not change anything. Before any of the alleged misconduct took place, Oaklawn was the only hospital in Marshall, and South Michigan was the only local ophthalmology group. The two entities naturally referred Marshall-based patients to each other—in one direction for eye check-ups and the like, in the other direction for surgeries. When Oaklawn decided not to establish an internal ophthalmology line at the hospital, the same relationship continued just as it always had. There's not one claim for reimbursement identified with particularity in this case that would not have occurred anyway, no matter whether the underlying business dispute occurred or not.

While the Martins identify 14 different surgeries for which Oaklawn submitted reimbursement claims to Medicare or Medicaid after the Board's decision, Dr. Martin notably performed 11 of those surgeries. Yet the Martins pleaded that Oaklawn's hiring decisions induced *Dr. Hathaway* to refer surgeries back to Oaklawn. They did not plead that Oaklawn's hiring decision induced Dr. Martin to make the same choice with her patients. Nor did the Martins plead that Dr. Hathaway ordered or required Dr. Martin to perform her surgeries at Oaklawn. And as for the three surgeries that Dr. Hathaway performed, two of those patients were first referred to Dr. Martin after the Board's decision, and only later went to Dr. Hathaway. Dr. Martin's independent decisions break any plausible chain of causation.

That leaves one surgery that Dr. Hathaway performed after the Board's decision for which Oaklawn sought reimbursement. But Dr. Hathaway performed that surgery in June 2019, over seven months after the Board's decision. Temporal proximity by itself does not show causation, and seven months would create few inferences of cause and effect anyway.

*See United States ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89, 100 (3d Cir. 2018) ("It is not enough . . . to show temporal proximity between [the] alleged kickback plot and the submission of claims for reimbursement."); *see also Boshaw v. Midland Brewing Co.*, 32 F.4th 598, 605 (6th Cir. 2022) (three-month time lapse between protected activity and an adverse employment action indicated lack of a causal link). Just how far into the future should the Board's alleged inducement extend? We can't say because the Martins don't tell us. The same problem that casts a pall over their remuneration theory exists here: No identifiable exchange of value occurred to anchor the scheme in time or place. In the Martins' and "the [g]overnment's view, nearly anything a [doctor] accepts . . . counts as a *quid*; and nearly anything a [doctor refers] . . . counts as a *quo*." *McDonnell*, 579 U.S. at 574–75. But that simply is not the law.

The Martins also identify eight claims that Dr. Hathaway's practice submitted for Medicare or Medicaid reimbursement after the Board's decision. According to the Martins, these claims resulted from Oaklawn's referrals. But the Oaklawn Board only decided not to hire an internal ophthalmologist. Oaklawn's individual physicians ultimately decided to whom they would refer patients. Because the Martins failed to allege that Oaklawn could control or direct the referral decisions of its physicians, their independent choices doom the chain of causation here, too.

The government, as *amicus curiae*, argues that, because Congress did not require but-for causation in the Anti-Kickback Statute, there's no reason why it would have done the same for a corresponding claim under the False Claims Act. But the "resulting from" language applies to all kinds of fraud claims without regard to whether the underlying claim has a causation component. The government also relies on legislative history that indicates the sponsors of the bill hoped to overrule a then-recent district court decision that had dismissed a False Claims action because the wrongdoer did not personally submit the resulting claim. 155 Cong. Rec. S10,853 (daily ed. Oct. 28, 2009) (Sen. Kaufman). But we generally do not consider legislative history in construing a statute with criminal applications, the idea being that no one should be imprisoned based on a document or statement that never received the full support of Congress and was presented to the President for signature. *United States v. R.L.C.*, 503 U.S. 291, 307–10 (1992) (Scalia, J., concurring); *United States v. Brock*, 501 F.3d 762, 770–71 (6th Cir. 2007),

*abrogated on other grounds by Ocasio v. United States*, 578 U.S. 282 (2016); *Carter*, 736 F.3d at 735 (Sutton, J., concurring). For that reason, the Third Circuit's contrary conclusion offers little assistance because it turns primarily on legislative history. *See Greenfield*, 880 F.3d at 96–97.

All in all, reading causation too loosely or remuneration too broadly appear as opposite sides of the same problem. Much of the workaday practice of medicine might fall within an expansive interpretation of the Anti-Kickback Statute. Worse still, the statute does little to protect doctors of good intent, sweeping in the vice-ridden and virtuous alike. *Cf. McDonnell*, 579 U.S. at 581 (rejecting "boundless" interpretation of bribery based on similar concerns in the political context). Examples clarify the point. Take the doctor concerned with outdated surgical equipment who tells a hospital that she will send referrals only if the hospital upgrades its facilities. That's a promised referral on one side. And if the other side is remuneration just because it's valuable, that's an Anti-Kickback Statute violation at the outset and a False Claims Act violation down the road for any claims resulting from those referrals. That's so even if the doctor's only motivation is ensuring the highest quality equipment for her patients. Or take the rural county that uses incentives to bring a hospital or a physician to its isolated community. Or take the hospital board that believes hiring one internal ophthalmologist would be worse for patient care than referring the work to several outside doctors.

A faithful interpretation of the "remuneration" and "resulting from" requirements still leaves plenty of room to target genuine corruption. Interpreted as a transfer of value, remuneration potentially encompasses a range of payments: consulting contracts, *United States v. McClatchey*, 217 F.3d 823, 827 (10th Cir. 2000), inflated rent payments, *McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1258 (11th Cir. 2005), bogus salaries, *United States v. Borrasi*, 639 F.3d 774, 777 (7th Cir. 2011), "bonuses," *United States ex rel. Parikh v. Brown*, 587 F. App'x 123, 126 (5th Cir. 2014), speaking fees, *Lawton ex rel. United States v. Takeda Pharm. Co.*, 842 F.3d 125, 129 (1st Cir. 2016), "referral fees," *Guilfoile*, 913 F.3d at 184, commission payments to a romantic partner, *Cairns*, 42 F.4th at 831, and the opportunity to purchase company stock, *id.* So long as proof exists that the referrals would not have been made without the remuneration, and that claims would not have been submitted to the

government without those referrals, causation for False Claims lawsuits would be satisfied too. *Id.* at 836–37.

### III.

Two considerations remain.  Because the Martins failed to allege a cognizable claim under the Anti-Kickback Statute, the district court did not abuse its discretion when it declined to exercise supplemental jurisdiction over the Martins' remaining state law claim.  *See Robert N. Clemens Tr. v. Morgan Stanley DW, Inc.*, 485 F.3d 840, 853 (6th Cir. 2007).  And because the Martins failed to allege a cognizable claim, we need not address whether the district court should have considered Oaklawn's and Dr. Hathaway's motions to strike material from the Martins' complaint.

We affirm.

_____

**CONCURRENCE**

_____

MATHIS, Circuit Judge, concurring in part and concurring in the judgment.  I concur in the majority opinion, except as to Section II.A.  As the majority opinion thoroughly explains, Dr. Shannon Martin and Douglas Martin failed to plausibly allege that the claims identified in their *qui tam* complaint "result[ed] from" a violation of the Anti-Kickback Statute.  42 U.S.C. § 1320a-7b(g).  This dooms their claim brought under the False Claims Act.  I would save the interpretation and analysis of "remuneration" for another day because even under the Martins and the government's broad interpretation, the allegations in the complaint fail to show causation.